Nichols, Judge,
dissenting:
In his ultimate findings, now discarded by the court, the Trial Commissioner, Paul H. McMurray, reported that “no ores of plaintiff were ever purchased under the terms and specifications of Circular 5, because such ores did not meet the specifications of that Circular.” I agreed. The court holds, however, that under the commissioner’s findings of underlying facts, which it does not materially alter, a major part of plaintiff’s ores were so purchased. I say major part on the basis of plaintiff’s figures in its brief. If it is right, it has won its case as completely as most litigants expect to do, despite losing some debating points in the court’s opinion. In further proceedings under Rule 47 (c) the record already made will, I believe, permit a calculation of plaintiff’s re *65 covery. It will surely be substantial. How was it possible for such a divergence to occur ?
The difficulty is, as shown in the settlement certificates in evidence in plaintiff’s exhibit 38, that the lime content in plaintiff’s shipments was not uniform. High in some shipments, it was low in others and apparently totally absent in some. The court views each separate shipment as a separate sale. The commissioner did not, as I construe his original report. The question is, as I see it, whether the guarantee in Circular 5 to pay for vanadium content, whether or not wanted or used, applies to a producer who never offered ore uniformly low in lime as the Circular required and never purported to be able to meet such a specification, whenever a separate shipment of his happened to meet it nevertheless.
The court achieves the result it deems just by interpreting out of existence a clause in Circular 5 which reads as follows:
(e) Deliveries in excess of 1,000 tons per year. Sellers desiring to deliver in excess of 1,000 short tons (2,000 pounds per ton) of ores during any calendar year [this would have included plaintiff] will be required to enter into a contract with the Commission providing for, among other things, a rate of delivery and the total quantity of ore to be delivered.
The fact plaintiff made no contract directly with the Commission covering the period in litigation I consider the court has a satisfactory answer to. Behold, however, what the court also says:
Paragraph (e) merely provided that, for the convenience of the purchaser and the orderly carrying-on of processing, shipments in excess of 1,000 tons [per year, I presume] would be made under advance written arrangements as to time, rate, and amount of delivery.
Let us see what an important part of Paragraph (e) is thus invisible to the court. Obviously, one of the “other things” would have to be the matter of specifications. It is scarcely conceivable the Commission intended to make contracts without specifications. There would be a great difference between a seller who offered to deliver a given quantity meeting a given specification as to lime content, and one who offered to deliver the same quantity with mere willingness to take a penalty for excessive lime. The lime was penalized because *66 it was thought to cause manufacturing difficulties. It would be just as difficult to schedule production in face of ignorance as to the lime content of future deliveries as it would be in face of ignorance as to time or quantity of such deliveries. Accordingly, I hold that Paragraph (e) definitely limits the commitment in Circular 5 to those who contract beforehand to deliver ore in a specified quantity meeting Circular 5 quality specifications, except as to producers of under 1,000 tons. The AEC made it clear in the note the court refers to that high-lime producers were to be dealt with under contracts, other than Paragraph (e) contracts.
The court further says:
The mere fact that plaintiff’s sales were under contract is irrelevant to their coverage.
The court surely cannot imagine that plaintiff could have simply dumped in excess of 1,000 tons per annum at the door of the Monticello plant and have expected payment, without any contract, either under Circular 5 or under the various high-lime announcements, referred to in the findings, but this is what it seems to say, and has to say to maintain its position. That is, if the Commission took such dumped ore, it would have brought it under Circular 5 to the extent it was low in lime. Of course, there would be no objection to a single contract to deliver, as separate items, low-lime and high-lime ores, and Circular 5 would then cover the former. But I find Paragraph (e) an absolute unambiguous bar to extending the Circular 5 guarantee to low-lime ore shipments delivered under a high-lime contract. I think the court has read ambiguity into it to achieve the result it considers just. And perhaps the result is just, but a commitment to pay for unwanted and useless vanadium is not exactly the kind of commitment to be extended beyond the carefully spelled out intention of its authors. At least, not in my view.
The court lays great stress on the subjective impressions of the plaintiff as to what its rights were. Yet plaintiff surely must have consulted counsel on a matter of such importance. We have no finding or request for a finding as to what counsel advised. If we start speculating what counsel would have *67 advised, we meet ourselves coming back. This case reflects an instance of the alternation of wild extravagance and mean economy, to'o often typical in Government procurement policy. As long as the former phase continued, plaintiff’s position was secure. But I for one would have advised that on the relapse to mean economy, inevitable sooner or later, the continuance of payment for unwanted and unused vanadium was hardly to be counted on. Plaintiff then would need a copper-riveted commitment, which Circular 5 would hardly have impressed me as being, with respect to plaintiff’s operation at any rate. Plaintiff’s subjective impressions and those of other parties were anticipations that the extravagant phase would continue, and not guides as to the extent of the guarantee legally enforceable when the mean phase set in.
Thus, in my opinion, Circular 5 was a commitment to pay for unused and unwanted vanadium only to small producers (under 1,000 tons a year) and producers who offered and contracted in advance to deliver ore in stated quantities on stated dates, meeting the specifications set forth in Circular 5 as to origin and chemical composition. Under that standard, the commissioner was right in finding that no ores of plaintiff were purchased under Circular 5, and plaintiff should not recover anything in this action.
Once litigation commences, parties sometimes labor to adorn the previously barren landscape with thickets of dubious contentions, many not previously heard of. This is rationalized on the theory that judges are unpredictable and no one can tell what ratio decidendi will appeal to them. No doubt this is valid in its place, but it involves a risk. Before the court has ever cut its way to the real heart of the controversy, it may have formed a belief that the claim is supported by false facts and reasons, or that the defense is merely technical and inequitable. The court in breaking through the thicket may generate so much momentum it smashes right on into the plate-glass picture window. Gazing at the wreckage herein, I conceive that something of this kind has happened. Thanks to all the underbrush, 90% of the court’s opinion would have been the same whichever side prevailed, and that 90% of course I would have *68 joined in. I would have turned aside when the plate-glass was reacted.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
HISTORICAL BACKGROUND
1. During World War II this country developed the atomic bomb, which development gave rise to an urgent military requirement for uranium, one of the elements used in the new atomic weapon. The Manhattan Engineering District, the group charged with and responsible for the development of the 'bomb, acquired the necessary uranium primarily from deposits in the Belgian Congo and in Canada. Another known source of the element utilized by the Manhattan District, but in a lesser degree, was the Colorado Plateau[1] where deposits had been mined and processed for the recovery of vanadium from carnotite-type and roscoelite-type ores, with mill tailings containing uranium in small quantities heretofore having been discarded. Defendant’s Manhattan Project group drew upon the mill tailings from the vanadium mills in the Plateau, which practice was the origin of a program to recover uranium domestically. There was no other known domestic source of uranium at that time.
Shortly after the end of World War II, only one vanadium mill in the Colorado Plateau was in operation, and the recovery of uranium as a byproduct had ceased completely.
2. The Atomic Energy Act of 1946, approved August 1, 1946, 60 Stat. 755, created the Atomic Energy Commission (hereafter referred to as A.E.C.) to administer the military and civilian use of fissionable materials. As declaration of policy, the Act stated a “paramount objective,” which was *69 substantially repeated in the Atomic Energy Act of 1954,[2]
* * * of assuring the common defense and security, the development and utilization of atomic energy * * * so far as practicable, * * * toward improving the public welfare, increasing the standard of living, strengthening free competition in private enterprise, and promoting world peace.[3]
3. Faced with a practically non-existent domestic uranium industry in 1946, the A.E.C., under the terms of the enabling legislation, was authorized and directed to procure source material, defined as uranium, thorium, or any other material determined to be peculiarly essential to the production of fissionable materials; in addition, the A.E.C. had authority to procure any other material determined to be capable of releasing substantial quantities of energy through nuclear chain reaction.
With respect to the acquisition of source materials, the 1946 Act provides as follows:
(5) Acquisition. — The Commission is authorized and directed to purchase, take, requisition, condemn, or otherwise acquire, supplies of source materials or any interest in real property containing deposits of source materials to the extent it deems necessary to effectuate the provisions of this Act. Any purchase made under this paragraph may be made without regard to the provisions of section 3709 of the Revised Statutes (U.S.C., title 41, sec. 5) upon certification by the Commission that such action is necessary in the interest of the common defense and security, or upon a showing that advertising is not reasonably practicable, and partial and advance payments may 'be made thereunder. The Commission may establish guaranteed prices for all source materials delivered to it within a specified time. Just compensation shall be made for any property taken, requisitioned, or condemned under this paragraph.
The 1954 Act contains substantially the same provisions.
4. Neither the 1946 Act nor the 1954 Act prescribe what formalities, if any, will be required to establish valid and *70 enforceable obligations on the part of the United States in the conduct of the A.E.C. in the administration of the atomic energy program.
5. Uranium is found in a number of different minerals, including uraninite, torbemite, autunite, uranophane, schroe-kingerite, and camotite; and ordinarily the ore containing such mineral is named for the predominant or most significant mineral, even though several other minerals are usually contained in the ore. The various types of uranium-bearing ores differ substantially in their composition and in the metallurgical treatment required for the successful recovery of their uranium oxide, U308, content.
6. Uranium source materials have been classified as “raw source material” and “refined source material”,[4] the first consisting of various types of ores, and the second being uranium concentrate, also known as “yellow cake.” The latter is the chemically-refined substance, composed principally of uranium oxide or U308, which is derived from the milling or processing of uranium-bearing ores or other uraniferous materials such as mill tailings. The high-grade concentrate or precipitate is the final product derived from the “raw material” category and the ultimate objective of procurement activities.
Throughout the proceedings in this case, the parties adhered to the distinction between uranium-bearing ore and uranium concentrate; and as the A.E.C. dealt in both during the period in question, the distinction will be maintained in these findings on the basis of the above explanation.
7. Following breakdown of the 1946-1947 discussions in the United Nations Atomic Energy Commission for control of nuclear weapons, the United States faced an urgent need to produce uranium for military purposes. Great importance was attached to that project and perhaps no military program undertaken by this country in peacetime has been considered more important or given higher priority. The program also emphasized the importance of minimizing dependence on foreign supply. Accordingly, an extensive program of exploration and development of domestic reserves of uranium-bearing ores was set in motion.
*71 THE A.E.C. PROGRAM AND POLICIES
8. Throughout the period of time pertinent to this case, the administration of the A.E.C.’s source materials program, both foreign and domestic, has been under the direction and responsibility of the Division of Raw Materials in Washington, D.C. The Director of the Division of Raw Materials from January 1, 1950, until the summer of 1963, when he retired, was Jesse C. Johnson, who had served for the 2 years immediately preceding that period as Deputy Director. The Grand Junction Operations Office, Grand Junction, Colorado, where plaintiff had official contact with the A.E.C., was charged with the administration of domestic raw material procurement in all areas west of the Mississippi River. At the times most pertinent to this case, Allan E. Jones served as manager of the Grand Junction office.
9. At the inception of the domestic uranium program, the A.E.C. conducted extensive exploration for uranium. Early in the program, the A.E.C. acquired a surplus government-owned vanadium mill located near Monticello, Utah, from the War Assets Administration and undertook to adapt it to the recovery of uranium from the camotite-type and roscoelite-type ores of the surrounding area in the Colorado Plateau. In succeeding years, the Monticello mill was the only processing or milling facility under the ownership and operation of the A.E.C. It served a number of functions other than refining and supplying concentrate for the atomic energy program, including assistance in the practical application of new processing techniques under study and development by the A.E.C. research facilities in Winchester, Massachusetts, and Grand Junction, Colorado. It also assisted in the accumulation of processing cost data useful in the negotiation of concentrate contracts with private milling concerns.
The A.E.C.-owned mill at Monticello was operated in an agency capacity by private companies from time to time until about January 1960, when the mill was closed.
10. Beginning in 1948, the A.E.C. formulated its program for the development of domestic sources of uranium. The tenor of the program, as formulated and as expressed in numerous press releases and speeches directed to the mining *72 industry, was to create the greatest possible interest in domestic uranium production. The announced policy of the A.E.C. was to stimulate private industry to engage in widespread prospecting, exploration and development of uranium ore reserves, and, since the United States was to be the sole purchaser of uranium for an indefinite period of time, adequate guarantees as to price and period of purchase were established in order to provide the incentive necessary for private industry to finance the development and operation of uranium mines and mills.
In addition to guarantees of price and periods of purchase, the A.E.C. developed a thorough assistance program to aid and encourage private enterprise in the development of the uranium industry. Among the various phases of the assistance program were the following: installation of A.E.C. field offices to assist people searching for uranium deposits; publication and dissemination of literature on uranium pros-specting; distribution of radiation anomaly maps derived from airborne surveys with scintillometers of vast areas of the west; display of ore samples; response to specific inquiries relating to geological or mining matters; assays of ore samples without charge; metallurgical testing of uranium ores to determine amenability to processing; supervision of drilling operations and the calculation of ore reserves on specific properties ; the building of access roads in remote areas to facilitate the removal of ore to markets; construction of a pilot plant at Grand Junction, Colorado, to develop improved processes for treatment of uranium-bearing ores; establishment of ore-buying stations at widespread places in the western part of the United States; and the issuance of numerous press releases [5] relating to and for the purpose of keeping the developments of uranium production before the expanding industry.
11. The A.E.C. repeatedly announced its policy to limit direct uranium ore purchases. Throughout the period here in question, the A.E.C. sought to purchase, whenever and *73 wherever practicable, the final concentrate product rather than the crude ores before refinement. Thus it was publicly disclosed on numerous occasions that the A.E.C. would not compete in the purchasing of uranium-bearing ores. At all times, it was preferred that the producers of the ores, the miners, deliver their ores to privately-owned mills under contract with the A.E.C. for process. Without a single exception, where a privately-owned mill had a contract with the A.E.C., the primary objective thereunder was the purchase and sale of concentrate. Consequently, the purchase of ores was largely left to the mill operators, but at all times pertinent, purchases by mill operators were subject to certain requirements and directives of the A.E.C. Such requirements were, at times, included in contracts with A.E.C. under which the mills operated.
Although the principal objective of A.E.C. was to purchase concentrate rather than ores in its uranium procurement program, it was necessary in the early stages of exploration and development of an area that it install and operate an ore-buying station to provide a market until it could be ascertained whether the deposits found there would require the opening of a privately-owned mill under the overall policy.
12. Early in the formulation of its domestic uranium program, the A.E.C. considered and rejected the adoption of a uniform price for the purchase of uranium concentrate from processing mills. The A.E.C. determined that all uranium concentrate purchases would involve individually negotiated contracts for the construction and operation of privately-owned mills, with the contracts providing for purchase of the mill concentrates, the price to be arrived at by taking into account the ore cost and the estimated milling costs, including plant amortization and profit.
13. Although A.E.C. admittedly was primarily interested in purchasing uranium concentrate in its procurement program, in order to stimulate the interest necessary to cause prospectors to go out and mine the ore in the first instance, a series of Domestic Uranium Program Circulars was issued. Those circulars were published in the Federal Register, commencing April 11,1948. They included guaranteed *74 prices, premiums, bonuses, and other information pertaining to pecuniary rewards for uranimn-bearing ores for extended periods of time, under terms and conditions to be satisfied.[6]
14. Effective April 11, 1948, and extending for a 10-year period, until April 10,1958, Circular 1 provided guaranteed minimum prices for high-grade uranium-bearing ores and mechanical concentrates assaying no less than 10 percent uranium oxide (U3Oa) by weight. Concurrently with the publication of Circular 1, the A.E.C. published Circular 2 which offered a $10,000 bonus for the delivery, in accordance with the provisions of Circular 1, of the first 40,000 pounds of ore or mechanical concentrates, assaying 20 percent or more U3Os, produced from a previously unworked deposit, as an incentive award.
Both Circulars 1 and 2 were intended to apply only to high-grade uranium-bearing ores, and consequently both Circulars excluded, in terms, the lower-grade carnotite-type or roscoelite-type ores of the Colorado Plateau.
15. Historically, the carnotite-type ore of the Colorado Plateau has been of commercial importance in the United States for the vanadium which it has yielded. Carnotite-type ore contains uranium only in small percentages by weight, other minerals always being more prevalent upon process. The fact that carnotite-type ore deposits were known in the Colorado Plateau, and the further facts that the ore was amenable to refining processes then in use and had been processed economically, induced the A.E.C. to issue circulars directed specifically to the production and delivery of such ores from the Colorado Plateau for their uranium content.
Contemporaneously with the publication of Circulars 1 and 2, the A.E.C. published Circular 3 establishing a guaranteed minimum price for carnotite-type and roscoelite-type ores under the terms and conditions therein set forth. On Feb *75 ruary 1,1949, Circular 3 was succeeded by Circular 5, which was to remain in effect through June 30,1954. This Circular was reissued on several occasions, with changes not pertinent here, extending the effective date through March 31,1962.
Circular 3 contained the following provision which was omitted from Circular 5: “Buyer is not obligated to purchase in excess of 5,000 short tons of ores from any one seller during any calendar year, although buyer may elect to do so.”
16. Because of the importance of Circular 5 in these proceedings, it is set out in its entirety as originally issued (later amendments not being here material) as follows:
§ 60.5 Guaranteed minimum friee for uranium-bearing camotite-type or roscoelite-type ores of the Colorado Plateau area — (a) Guarantee. To stimulate domestic production of uranium-bearing ores of the Colorado Plateau area, commonly known as camotite-type or roscoelite-type ores, and in the interest of the common defense and security, the United States Atomic Energy Commission hereby establishes the guaranteed minimum prices specified in § 60.5a effective during the period, February 1,1949 through June 30,1954, for the delivery of such ores to the Commission at Monticello, Utah in accordance with the terms of this section and § 60.5a.
Note: In §§60.1 and 60.2 (Domestic Uranium Program, Circulars No. 1 and 2), the Commission established guaranteed prices for other domestic uranium-bearing ores, mechanical concentrates, and refined uranium products.
(b) Effect on §§ 60J, 60.§a and 60.4- Sections 60.3, 60.3a, 60.4 which also apply to carnotite and roscoelite ores, are not revoked by the issuance of this section and § 60.5a and sellers may elect to deliver ore under the provisions of §§ 60.3, 60.3a, and 60.4 rather than under this section and 60.5a, at their option, during the unexpired terms of §§ 60.3, 60.3a and 60.4 (through April 11, 1951 and June 30, 1949, respectively). It is believed, however, that in most cases the provisions of this section and § 60.5a will be more favorable to producers.
(c) Definitions. As used in this section and in § 60.5a, the term, “buyer” refers to the U.S. Atomic Energy Commission, or its authorized purchasing agent. The term “ore” does not include mill tailings or other mill products.. The term “seller” refers to any person offering. uranium ores for delivery to the Commission. Weights are avoirdupois dry weights, unless otherwise specifically provided.
*76 (d) Deliveries of not to exceed lfiOO tons per year. To aid small producers, any one seller may deliver without a written contract but otherwise in accordance with this circular up to, but not exceeding, 1,000 short tons (2,000 pounds per ton) of ores during any calendar year.
(e) Deliveries in excess of 1,000 tons per year. Sellers desiring to deliver in excess of 1,000 short tons (2,000 pounds per ton) of ores during any calendar year will be required to enter into a contract with the Commission providing for, among other things, a rate of delivery and the total quantity of ore to be delivered.
(f) Delivery. Seller, at his own expense, shall deliver and unload all ores at the buyer’s depot at Monticello, Utah. Deliveries shall be in lots of not less than 10 short tons (2,000 pounds per ton) unless special arrangements have been agreed upon by buyer, but such lots may be delivered in more than one load. Days and hours during which ore may be delivered will be posted at the depot.
(g) Weighing, sampling and assaying. Buyer will bear the cost of weighing, sampling and assaying. The net weight of each load will be determined by the buyer’s weighmaster on scales which will be provided by the buyer at or in the vicinity of the purchase depot and such weight will be accepted as final. A weight ticket will be furnished seller or his representative for each load. Each lot of ores will be sampled promptly by the buyer according to standard practice and such sampling will be accepted as final. Seller or his representative may be present at the sampling at his own expense. The absence of seller or his representative shall be deemed a waiver of this right. Buyer will make moisture determinations according to standard practices in ore sampling. All final samples will be divided into four pulps and distributed as follows: (1) The seller, or his representative, will receive one pulp; (2) the buyer will retain one pulp; (3) the other two pulps will be reserved for possible umpire analysis. The buyer’s pulp will be assayed by the buyer. The seller may, if he desires, and at his own expense, have his pulp assayed by an independent assayer. In case of disagreement on assays as to any constituent of the ores, an umpire shall be selected in rotation from a list of umpires approved by the buyer whose assays shall be final if within the limits of the assays of the two parties; if not, the assay which is nearer to that of the umpire shall prevail. The party whose assay is the farther from that of the umpire will pay the *77 cost of the umpire’s assay for the constituent of the ores which is in dispute. In the event that the umpire’s assay is equally distant from the assay of each party, costs will be split equally. In case of seller’s failure to make or submit assays, buyer’s assays shall govern. After sampling, the ores may be placed in process, commingled, or otherwise disposed of by buyer.
(h) Payment. Buyer will make payment promptly but payment will not be made until an entire minimum lot of ten short tons (2,000 pounds per ton) has been delivered and accepted, unless special arrangements have been agreed upon by buyer, in which case there may be an extra charge for assaying and sampling. Moisture determinations, analyses and settlement sheets, together with the check in payment, will be mailed to seller.
(i) Inquiries. All inquiries concerning the provisions of this section and § 60.5a, offers to deliver ores, or questions about the Commission’s domestic uranium program in the Colorado Plateau area should be addressed to:
United States Atomic Energy Commission, Post Office Box 270, G-rand Junction, Colorado; Telephone: Grand Junction 3000.
(j) Licenses. Arrangements will be made by the Commission for the issuance of licenses, pursuant to the Atomic Energy Act of 1946? covering deliveries of source material to the Commission under this section and § 60.5a.
(k) Limitation of commitment. Commitments by the Commission to accept delivery of ores are limited to the provisions of this section and § 60.5a as amended from time, to time, or to written contracts between the Commission and sellers. Other commitments purporting to be made by the Commission’s field personnel or other agents of the Commission will not bind the Commission unless they are in accord with the provisions of this section and § 60.5a or other official circulars.
§ 60.5a. Schedule // Minimum prices, specifications, and conditions — (a) Prices. Payment for delivery of the ores will be computed on the following basis:
(l) Uranium, (i) Ores assaying less than 0.10%: no payment. Any such ores which are delivered to the purchase depot shall, unless otherwise specifically agreed to by buyer, become the property of the buyer as liquidated damages for buyer’s expense of weighing, sampling, and assaying, and after sampling may be placed in process, commingled, or otherwise disposed of by buyer. If seller has any question as to the quality of his *78 ore, it is suggested that before shipment and delivery to the purchase depot a representative sample be submitted to the buyer or to one of the umpires for assay at seller’s expense. The buyer at its discretion may assay a limited number of samples without charge.
(ii) Ores assaying 0.10% U308 and more, as follows:
Payment per VsOs assay: P°nnd V*Oa
0.10 percent_$0. 50
0.11 percent_ . 70
0.12 percent_ . 90
0.1S percent_ 1.10
0.14 percent_ 1.30
0.15 percent_ 1. 50
0.16 percent_ 1. 60
0.17 percent_ 1.70
0.18 percent_ 1.80
0.19 percent_ 1.90
0.20 percent and more_ 2. 00
(iii) Premiums on uranium: $0.25 per pound for each pound of U308 in excess of 4 pounds U308 per short ton (2,000 pounds per ton) of ore and an additional premium of $0.25 per pound for each pound in excess of ten pounds UsOs per short ton. Fractional parts of a pound will be paid for on a pro rata basis to the nearest cent.
(2) Vanadium. V205 at $0.31 per pound up to, but not exceeding, ten pounds of V205 for each pound of U808 contained in ores. No factor will be included for V205 in excess of ten pounds for each pound of U308, although buyer may, from time to time, publicly announce that, for limited periods by written agreements with individual producers, V205 in excess of ten-to-one will be paid for. Any such announcement will be made by posting a notice to this effect at the Monticello depot and through such other channels as are deemed suitable to achieve maximum dissemination among producers. Excess V205 shall be deemed to be buyer’s property.
(3) Allowances, (i) A development allowance of $0.50 per pound U308 contained in ores assaying 0.10% Us08 or more in recognition of the expenditures necessary for maintaining and increasing developed reserves of uranium ores. Fractional parts of a pound will be paid for on a pro rata basis to the nearest cent. Sellers accepting this allowance are deemed to agree to spend such funds for the development or exploration of their properties. Sellers delivering less than 1,000 short tons per calendar year will not be required to submit an ac *79 counting record of expenditures for development or exploration pursuant to this agreement but sellers delivering in excess of 1,000 short tons per calendar year will be required, under the terms of their contracts, to submit proof satisfactory to the Commission that funds equivalent to the amount received as development allowance have been spent for development or exploration either during the contract period or within six months thereafter, unless otherwise provided in the contract.
(ii) A haulage allowance of 6$ per ton mile for transportation of ore paid for under this circular from the mine where produced to the purchase depot specified by the Commission, up to a maximum of 100 miles. The haulage distance from the mine to the purchase depot will be determined by the Commission and its decision will be final. Tonnages for purposes of this allowance shall be calculated on the basis of natural weights rather than dry weights.
(4) Adjustment of assays. Assays shall be adjusted to the nearest 0.01% for purposes of payment.
(b) Quality and size. Ores will not be accepted by buyer under this circular which in buyer’s judgment:
(11 Contain less than 0.10% UsOs;
(2) Contain more than three parts of lime (CaC03) to one part of V205 or a total of more than 6% lime in the ore;
(3) Contain impurities deleterious to buyer’s extraction process or for any other reason are not amenable to it;
(4) Contain lumps in excess of twelve inches in size.
Note: The Commission will be interested in discussing arrangements for delivery to it of types of uranium-bearing materials other than those for which guaranteed prices have been established, such as tailings, miU products, and ores of types not acceptable under §§ 60.5 and 60.5a.
17. The A.E.C. opened its first ore-buying station at Monti - cello, Utah, under a contract dated June 25, 1948, effective May 1, 1948, whereby the American Smelting & Refining Company was expressly appointed the Commission’s “* * * Agent for the purchase and payment for delivery of ore * * *” either under the terms of the A.E.C. Circulars or under special contracts with ore producers.
American Smelting served as ore purchasing agent for the A.E.C. until February 1, 1956, when the metallurgical firm *80 of Lucius Pitkin, Inc., succeeded to that function. Lucius Pitkin, Inc., continued to act in this capacity, as the A.E.C.’s buying agent at the Monticello ore purchase depot, until March 31, 1962, when Circular 5, Revised, expired and the ore purchase depot closed. (When Circular 5 was revised in 1951 it was called Domestic Uranium Circular 5, Revised; the document is referred to in these findings either as Circular 5, or as Circular 5, Revised.)
18. By its terms, Circular 5 is confined to “uranium-bearing ores of the Colorado Plateau area, commonly known as carno-tite-type or roscoelite-type ores.” Within this limitation for the type of ores from a given area, Circular 5 additionally called for ores of a specified quality and size, among which specifications the Circular expressly provided that ores containing less than 10 percent U308, or more than three parts of lime (CaC03) to one part of vanadium (V206), or a total of more than 6 percent lime would not be accepted by the A.E.C. The lime content specification was included in the Circular requirement because of known amenability refining processes in use at existing mills at the time Circular 5 (originally Circular 3) was in effect, including the A.E.C. mill at Monticello.
In line with the “Note” at the end of Circular 5 the A.E.C. at first sought special arrangements, under special contracts, for the delivery to A.E.C. of ores which did not meet the specifications of the Circular. In reference to the lime content requirement, the special arrangements resulted in part, from a reasonable expectation of A.E.C. that it would develop suitable processing techniques, which would render the uranium contained in the ores economically recoverable.
19. The policy of the A.E.C. to accept at its Monticello station uranium-vanadium ores which would not be acceptable under the specifications of Circular 5, Revised, because of the high lime content in the ores, was publicly announced on July 10,1949. The announcement expressly declared that, except for initial trial shipments in small quantities, the obligation of A.E.C. would be limited to written, contractual commitments with each producer. The price schedule for *81 payment to the producers for deliveries of their ores under these special arrangements was to be patterned on the price schedule in Circular 5, but with appropriate deductions for higher treatment costs or lower metallurgical recovery.
20. For the purpose of procuring uranium from whatever sources became available, the A.E.C. announced on March 12. 1950, its proposal to open a purchase depot at Marysvale, Utah, for autunite-type and tobernite-type uranium ores discovered in that area. As these ores did not come within the terms of Circular 5, the A.E.C. advised that its obligation to accept Marysvale ores would be limited to contractual commitments negotiated with individual producers.
The intention of the A.E.C. to open an ore-purchasing station at Marysvale was predicated, in part, on the desire to afford a market for the ore of producers in the area until it could be determined whether or not a more permanent installation, including a processing mill, could be justified. Price schedules for purchase agreements between the A.E.C. and the producers were to model the Circular 5 price schedule for carnotite and roscoelite types of ores of the Colorado Plateau although no payment would be made for any other mineral than uranium, “as the Marysvale ores contain [ed] no other metals in commercial quantities.”
21. In an officially approved speech released to press and radio and delivered at a meeting of the American Mining Congress on August 80, 1950, Jesse C. Johnson, A.E.C. Director of Eaw Materials, stated the A.E.C. uranium procurement policies both within and without Circulars 1 and 5 as follows:
❖ ❖ ❖ ❖
Let me review briefly this program and show how it will apply to ores not covered by Circular No. 5, which relates to carnotite ores of the Colorado Plateau, or by Circular No. 1, which is for high-grade ores.
As previously indicated, the Commission’s buying schedules and policies for carnotite ores of the Colorado Plateau _ already have resulted in active development and production in that area. Circular No. 1, which established a ten-year guaranteed minimum price for high-grade ores and concentrates, was designed for high- *82 grade pitchblende deposits of the type which in the past had furnished most of the world’s uranium. Except for the Colorado carnotite deposits, which were covered, by a special buying schedule, we had little basis for predicting the kind of uranium deposits which would be found in the United States. There had been little interest in, and little prospecting for uranium. We considered it likely that other deposits might be found to which the Circular No. 1 schedule would not apply. Therefore} a provision was included in Circular No. 1 for. special arrangements under negotiated contracts when justified by the quantity and the cost of production.
Our experience during the past two years indicates that most domestic uranium ores will require special schedules. Therefore, there is need for a more definite statement of price policy- — a statement which gives the essential terms of ore-buying schedules that may be established and also the basis upon which the Commission will purchase high-grade mill concentrates and precipitates.
Ore-buying schedules for crude ore not covered by Circulars No. 1 or No. 5 will be established for each mill, based on the prices for uranium content set forth in Circular No. 5, the circular which applies to carnotite ore of the Colorado Plateau. Contracts for the construction and operation of mills will be arrived at by negotiation. It is expected that most of these contracts will be for the purchase of mill concentrates or precipitates at a unit price. The price paid for the mill product will be arrived at by taking into account ore cost and the estimated milling cost, including plant amortization, metallurgical losses and profit. For the purpose of such negotiations, all mills may be considered custom mills, even though the ore supply and mill may be owned by the same company. It is expected, however, that most mills will treat at least some custom ore.
This is the way the new ore-buying schedules will be set up:
1. Price: $2.50 to $3.00 per pound of Us08 content, depending upon grade, delivered at a mill. This price includes a development allowance of fifty cents per pound of U308 content.
2. In addition, a haulage allowance may be granted to defray part of the cost of moving the ore from mine to mill.
*83 3. Ore specifications will be established by each mill and ore which does not meet specifications will not be accepted. Metallurgical tests also may be required to determine acceptability. The minimum U308 content for an acceptable ore may be from 0.20% to 0.30% U3Os, depending upon the type of ore.
4. Payment may be made for other valuable constituents of the ore provided the receiving mill can recover them economically. In general, payment for these other constituents will be based upon their market value, less deductions to cover metallurgical losses and the cost of milling, transportation, smelting, refining, and marketing.
As in the case of other metals, a market for ore is contingent upon having a mill, which can treat the ore, within economic haulage distance. The Commission does not guarantee to provide a mill. We prefer that industry build and operate the mills, as it is doing on the Colorado Plateau, and sell the chemical precipitate to the Commission under unit-price contracts.
•■ü * * * *
22. Over the succeeding years of the procurement program, additional uranium-bearing ore deposits were located both on and off the Colorado Plateau. In conformity with its established policy, the A.E.C. from túne to time opened and operated additional ore-buying stations (besides the Monticello and Marysvale depots) to provide a ready market Where ore sites were discovered and developed over a vast area of the Western United States. These stations (except for the Monticello depot) were temporary in nature and were closed as privately-owned facilities became operative in the vicinity pursuant to specially negotiated mill contracts between the operators and the A.E.C.
23. The opening of an additional ore-buying station was usually announced by press release, and the press release also advised what types of ore would be purchased and the methods by which contracts would be consummated.
The special ore-buying stations which the A.E.C. eventually established in various areas, as publicly announced, and the period of their operation are as follows:

*84

•Dates are approximate.
24. On two occasions, August 14,1955, and March 18,1956, the A.E.C. announced that because of newly-discovered processing methods it would accept at its Monticello (and at Moab under the 1956 release) purchasing depot high-lime uranium-bearing ores, which previously had not been accepted as meeting the specifications of Circular 5. The high-lime ores would be accepted under the terms of either of the following price schedules, whichever would produce the greatest return to the producer:
Schedule I
Payment for such ores delivered and accepted will be at the prices set forth in Domestic Uranium Program Circular 5, Revised, except that a deduction will be made of one dollar ($1.00) per dry ton plus thirty cents ($0.30) per dry ton for each one percent (1.0%) of lime (CaCQs) in excess of six percent (6.0%) fractions in proportion; or
Schedule II
Payment for such ores delivered and accepted will be at the prices set forth in Domestic Uranium Program Circular 5, Revised, except that no payment will be made for vanadium and a deduction of $3.70 per ton will be made.
The deduction of $3.70 per ton was deleted in the 1956 announcement, but payment for any other constituent in the ore was precluded under this alternative.
Both announcements stated that ores meeting the specifications of Circular 5, Revised, would not be affected thereby, *85 and that high-lime penalty schedules were already established at privately-owned mills for ores that did not meet the amenability requirements of the plant concerned. The lime penalty was imposed to defray increased operating costs in the process of recovery of ores not of the quality called for by the terms of Circular 5, Revised.
25. Throughout its operations the A.E.C. has uniformly pursued its announced policy of purchasing at its buying station at Monticello, Utah, from any one producer without a written contract up to 1,000 tons per year of uranium ore of the camotite-type or the roscoelite-type under the terms and specifications of Circular 5. Any purchase at Monticello of such ores from any producer in excess of 1,000 tons per year has been made only pursuant to written agreement between the A.E.C. and such producer in regard to quantity and time of delivery.
All purchases of uranium ore at any other A.E.C. buying station, irrespective of the tonnage sold by any producer in any year, have only been made pursuant to written contracts between the A.E.C. and the producers, as required by the A.E.C., specifying quantity and time of delivery. With few exceptions, none of which are pertinent to this case, the A.E.C. uranium ore purchases, either by contract with the producers or within the 1,000 ton limitation, complied with the price schedule and conditions of Circular 5.
The application of guaranteed Circular 5 prices for the uranium content of ores was announced repeatedly in various press releases concerning establishment of various public speeches released to the press and delivered by officials of the A.E.C. The ore-buying contracts used the Circular 5 prices for the uranium content of the ores, although in some instances lime penalties were imposed.
Circular 5 prices for the uranium content of ores were used in arriving at unit cost milling contracts with private operators. In only four of the twenty-seven mill contracts was there separate reimbursement for the vanadium content of the ores processed. And in only three mill contracts was the price of the vanadium factored in the uranium concern- *86 trate price [Comm. Ex. 1]. A.E.C. also utilized the price schedule for the uranium content in ore promulgated in the Circular as a basis for its ore-buying arrangements (subject to a few exceptions) to establish a uranium ore price as nearly uniform as possible throughout the industry, subject only to certain penalties imposed because of varying degrees of amenability of the ore.
26. With the exception of the output from the A.E.C.’s Monticello mill, all concentrate derived from domestic uranium-bearing ores was obtained through concentrate contracts, or mill contracts,[7] individually negotiated with the owner or owners of a substantial supply of amenable uranium ore in the area to be served by the mill. As expressly provided in each of such contracts, the A.E.C. required that, to the extent of a specified percentage of the pertinent mill capacity, the mill owner purchase and process uranium ores, produced in the area by independent miners, when such custom ores were determined by the mill operator to be amenable to its recovery process.
A mill or concentrate contract was not, by its terms, subject to cancellation by unilateral action of the A.E.C., and, in accordance with the terms thereof, the mill operator was guaranteed or assured a firm level of procurement during the period covered by the contract.[8] The custom ore producers in that area, as a group, were assured a market at the mill to the extent of their respective participation in the sale to the mill owner of the custom ores required to be processed.
The mill contracts uniformly and expressly allowed as part of the formula for fixing the price to be paid for uranium concentrate, the factor of allowance of Circular 5 prices for the uranium content of the ore processed, whether such *87 ore was that produced by the mill operator or custom ore sold to the mill by another producer. However, the mill contract required the mill operator to pay not less than Circular 5 prices to the producer for custom ores.
27. As a preliminary to active negotiations with the A.E.C., a mill contract applicant was required to furnish certain information relative to the proposed mill operation. Among other things, the applicant had to show financial and technical capacity for the operation of such a facility, estimated costs of the operation, estimated available sources of ore and the quantities of ore which it was expected would be available for processing by the proposed mill where it was to be located. With respect to the supply of ore from the district in which the mill would be located, the applicant had to show the estimated quantity of ore that might be processed from other, independent or “custom” sources near or “tributary” to the proposed mill, in addition to the applicant’s own “captive” ore. This requirement was in line with the program policy of the A.E.C. to insist, in its contracts with each mill operator, that a certain percentage of the mill operation be allocated to processing “tributary ore.” It is not established by the record presented that, in any given instance, the A.E.C. ever demanded that the mill operator accept the ores of one producer rather than that of another; the determination as to whether a producer’s ore was amenable to the mill’s refining process was under the exclusive control of the mill operator.
No representative of independent or “custom” ore producers attended or in any way participated in contract negotiations between the A.E.C. and prospective mill operators. There existed, however, on the part of both the A.E.C. and the contractor a conscious appreciation that the results of their negotiations would directly affect the ore mining operations of independent producers in the area. Consequently, consideration was given to the independent producers as a group, and the total output of the group was one of the factors which entered into the percentage of milling capacity which the mill operator would be required to purchase from the independent producers.
*88 28. By 1960 there were 25 private mills in active operation under the ownership of the contractors indicated below:

29. Throughout the years pertinent to this case, press releases and public speeches delivered by officials of the A.E.C. played an important role in its overall program (see Finding 10, footnote 5). In addition to stressing the military need for uranium and instilling a firm conviction that the government would continue to be sole purchaser for some time to come, the announcements kept the booming uranium industry informed on continuing developments, affording a measure of anticipation and prediction of things to come.
On May 24, 1956, the A.E.C. issued a public announcement concerning a new domestic procurement program, parts of which read as follows:
The U.S. Atomic Energy Commission today announced establishment of a new domestic uranium pro *89 curement program for the period from April 1, 1962 through December 31,1966, * * *.
The new domestic procurement program provides a guaranteed market for all uranium concentrates produced by domestic mills from domestic ores, * * *. The price established is $8.00 per pound of U308 contained in normal mill concentrates or precipitates.
This action was taken in recognition of the need for a continuing Government market in order to maintain a high rate of exploration and development. * * * The new domestic uranium procurement program provides assurance of a government market for an additional period of almost five years beyond March 31,1962. This assurance will assist uranium mining and milling firms in planning future operations.
The present uranium ore procurement program will remain in effect until March 31, 1962. _ The new program establishes a base price for domestic uranium concentrates, rather than ores, for the period from April 1, 1962, through December 31, 1966. * * *
*****
Uranium concentrate producers desiring to sell to the Commission will be required to enter into contracts specifying the period of delivery, the quantity to be delivered, the rate of delivery, the place of delivery, the type of packaging and other standard provisions of commercial-type contracts. The contracts may cover the period April 1, 1962, through December 31, 1966, or a shorter period. * * *
* * * q^ere -^yin be no commitment for the purchase of vanadium after March 31,1962.
* ❖ * #
30. New discoveries of ore deposits and the ever increasing rate of uranium concentrate production caused the A.E.C. to reconsider the new domestic uranium procurement program announced in May 1956. October 28, 1957, Mr. Johnson delivered a speech (released to the press the same date) before the Fourth Annual Conference of the Atomic Industrial Forum in New York, and announced that, by reason of a decision of official policy determined by the A.E.C., limitations were being imposed upon the further expansion of concentrate purchase commitments. It was announced by Mr. Johnson in behalf of the A.E.C. that:
*90 * * * we have arrived at the point where it no longer is in the interest of the Government to expand production of uranium concentrate. * * *
*****
Under these circumstances the Commission, at this time, is faced with limiting commitments for additional domestic uranium production. * * *
# * # Jfi &
31. During the period of time between October 28, 1957, and April 2, 1958, the A.E.C. withdrew or suspended the authority of its procurement officials to negotiate uranium concentrate or mill contracts. During this period, a comprehensive study was made by the Grand Junction office of ore reserves and milling capacities in producing areas. Commencing in April 1958, milling contracts were negotiated on the basis of conclusions reached as a result of the study. One of the changes of policy which the A.E.C. adopted as a result of the study (and which had been underway since mid-1957) was the elimination of cost factors for any minerals other than uranium in ores processed by the mills. To this end, as contracts of mill companies were revised, as their terms expired, or before expiration date, if an amendment was entered into, the mill under the new or revised contract with the A.E.C. no longer received the benefit of the other-than-uranium-mineral cost factor, and, correspondingly, the mill was no longer required to pay independent producers for any mineral in the ores delivered to it for process, except uranium. The latest such change occurred effective December 31, 1961; the majority of deletions of payment for minerals other than uranium became effective in the last part of 1957, and in 1958. Nevertheless, through March 31,1962, the price paid for the uranium in the ore purchased from the independent producers had to be at least as favorable as the applicable Circular 5, Revised, price.
32. On November 24,1958, the A.E.C. announced that the 1962-1966 domestic uranium concentrate program promulgated in May 1956, was to be modified. The policy of the A.E.C. was to withdraw prospectively the guaranteed minimum price for uranium concentrate, as announced, and to invite “contracts to purchase concentrates to the extent that *91 requirements dictate and .on such terms and conditions and at such prices as the Commission may from time to time agree upon.” It was further announced that this new concentrate program would limit purchases of the A.E.C. to current milling contracts, or, among others,
* * H* # *
(B) Appropriate extensions of current milling contracts to the extent the Commission determines that the milling facilities are needed for the presently existing mining operations and developed ore reserves;
*{• ‡ $
The independent producers were considered in the revision of the May 1956, program to the extent that:
A
•p V fp tp c|?
* * * Protection will be given the independent miners by incorporating in all new milling contracts and extensions to existing milling contracts provisions designed to provide independent mine owners a fair share of available milling capacities.
*****
33. During the period April 11,1948, to March 21,1962, the country’s total uranium ore production amounted to approximately 40 million tons. Of this total, the A.E.C. purchased about 1 million tons at its Monticello ore purchasing station and about 2.5 million tons at its other ore buying stations. The balance was delivered for processing to the privately owned mills which operated under the terms of specially negotiated contracts with the A.E.C. for the sale to the A.E.C. of the mills’ refined product, the uranium concentrate. The A.E.C. acquired some 70,000 tons of ore without contract under the domestic uranium program; the rest was under contract. Only about three to five percent of all the uranium ore produced in the country (mainly that mined by very small producers) would have been acquired under the program if the A.E.C. had limited its acquisitions to 1,000 tons per year from each producer. If the guarantee in Circular 5 were restricted to 1,000 tons per year, plaintiff’s guaranteed sales would have been less than $25,000 per year.
*92 PLAINTIEP’S operation under the domestic uranium procurement PROGRAM OP THE ATOMIC ENERGT COMMISSION
34.Plaintiff is a Utah corporation qualified to do business in Arizona. The corporation was organized in January-1955, after an investigation and conclusions based thereon of Eobert G. Harding, an official of plaintiff corporation and a witness at the trial, to the effect that uranium-bearing ores might be located on the Navajo Indian Reservation, in and about the area of Monument Valley, Arizona, which is within the area encompassed by the Colorado Plateau. The Articles of Incorporation of plaintiff states as some of its many purposes:
To engage in, carry on and conduct a mining business, including the acquisition of ore-bearing properties, minerals and natural resources of all kinds, and the developing, operating, milling, processing, concentrating, refining and sale of the same.
To buy, sell, lease, handle, store and otherwise deal in mineral properties of all kinds.
% ij4 # ‡
35.Plaintiff’s principal incorporators, together with the shares then subscribed by each, are as follows:
George Bishop_ 2,700 shares
Robert Schubach_ 1, 250 shares
Joe Dupler_ 500 shares
Gilbert Moyle_ 250 shares
Wilford Burton_ 250 shares
Sarah M. Bishop_ 50 shares
In addition, 1,666 shares were issued to Eobert G. Harding and Richard Hyde for their services in locating, investigating and bringing to the attention of the above group the potential mineral wealth which might be available on the Navajo Indian Reservation.
36.In the spring of 1955 plaintiff secured exploration permits and mining leases from the Navajo Indian Nation and soon thereafter began exploratory drilling operations. In late June or early July of the same year, ore was discovered and called the Moonlight claim. In succeeding months three other claims were discovered (the Starlight, the Sunlight and the Walter Chief), all of which were in the general area of *93 the Moonlight claim, located on the Navajo Indian Reservation in Arizona, approximately 30 miles southwest of Mexican Hat, Utah, in Monument Valley.
37. Mining was first started on the Moonlight claim on or about November 9,1955, and on the Starlight and Sunlight claims on or about February 7, 1956. After mining operations were underway, plaintiff received the following letter, dated February 21,1956, from Charles Rasor of the A.E.C.’s Grand Junction Office, addressed to George Bishop, president of plaintiff corporation:
This office has been advised that your company wants an ore purchase contract to sell uranium ore at the Monticello, Utah, ore-buying station.
In order that the contract may be prepared we require the following information:
(1) Name and address of the company or individual that will sell the ore.
(2) Name and locations of mining claims from which the ore will be produced.
(3) If the seller is a corporation, furnish the name of the state in which it is incorporated. If it is a partnership, furnish the names of all partners.
(4) An estimate of the monthly rate of ore delivery for the next six months.
* * * * *
38. Circular 5 called for carnotite-type and roscoelite-type ores from the Colorado Plateau. The framers of Circular 5 did not intend to describe the mineralogical make-up of the ore thereby, but rather, the description related to the type of ores that historically had been mined from the Colorado Plateau, as the terms were known and understood by the miners and prospectors in that area. The miners and prospectors, in turn, believed that Circular 5 carnotite-type ores were the ores of the Colorado Plateau which contained vanadium and uranium. In this context, plantiff’s ores qualified as Circular 5 ores to the extent that they were carnotite-type ores; but the plaintiff’s production of ore was subject to the specifications thereunder for quality and size. Since the plaintiff at no time mined roscoelite-type ores, and no such contention was made during the proceedings, this type ore will not be mentioned in reference to Circular 5 through the remainder of these findings.
*94 39. On April 26, 1956, plaintiff entered into Contract No. AT (05-1)-853 with, the A.E.C., which contract bore the title “ore purchase agreement (Special High Lime).” The contract called for plaintiff to deliver a maximum of 3,000 tons of uranium ore to the A.E.C.’s Monticello ore purchasing station during the period April 1, 1956 to June 30, 1956. Article III thereof provided as follows:
Article III
Delivery of ores hereunder will be in accordance with the specifications and conditions set forth in the United States Atomic Energy Commission’s Domestic Uranium Program, Circular 5, Eevised, and payment for ores delivered and accepted hereunder will be at the prices, premiums, and allowances as set forth in said circular or any revision or amendment thereof, except that:
1. The Buyer will purchase ores containing lime (CaC03) in excess of six percent (6.0%) but only upon the following terms and conditions:
The Buyer will compute the price payable for such ores in accordance with the methods herein provided in both Schedule I and Schedule II. The higher of the two prices thus determined by the Buyer will thereupon be paid to and accepted by the Seller for all ores delivered hereunder.
Schedule I A deduction from ore payment will be made of one dollar ($1.00) per dry ton plus thirty cents ($0.30) per dry ton for each one percent (1.0%) of lime (CaCÓ8) content in excess of six percent (6.0%) fractions in proportion; or
Schedule II No payment will be made for vanadium contained in ores delivered hereunder.
2. Buyer will not be required to accept any ore delivered hereunder which contains in excess of 10 percent moisture.
3. It is intended that the Seller deliver ores containing at least 0.20% U308. In the event that the average grade for any calendar month delivered hereunder is less than 0.20% U308, the Buyer may terminate this contract by so notifying the Seller in writing at any time within thirty (30) days from the end of a calendar month in which shipments have averaged less than 0.20% of U308. Failure of the Buyer to exercise this right to terminate in.the case of any particular calendar month shall in no event be considered a waiver of subsequent rights to terminate for monthly shipment averages of less than 0.20% U,Os.
*95 4. Special arrangement may be made in writing without amending this contract, between the Buyer and the Seller for delivery and acceptance of ores not otherwise acceptable under the provisions of this contract.
During the ensuing months the contract was amended on several occasions by mutual agreement of the parties to permit an enlarged delivery total of 16,000 tons of uranium ore to the A.E.C.’s Monticello ore purchasing station during the extended period of April 1, 1956 to December 31, 1956.
40. At the expiration of the parties’ 1956 ore purchase agreement on January 25, 1957, Mr. Easor of the A.E.C. Grand Junction office, wrote to plaintiff proposing, and enclosing, an agreement for the delivery of 7,000 tons of ore to the Monticello ore purchasing station during the period from January 1, 1957, to February 28, 1957. In his letter Mr. Easor made the following observation:
* * ❖ # *
Please note that this agreement terminates ore deliveries by your organization to the Monticello, Utah, ore-buying station on February 28,1957. The Texas-Zinc Minerals Corporation anticipates opening their ore-buying station sometime in February 1957 for the purchase of uranium ores produced in areas tributary to it, such as the Monument Yalley Mining District. We suggest that you direct an inquiry to Texas-Zinc Minerals Corporation, 628 Eood Avenue, Grand Junction, Colorado, prior to shipping any ore to its ore-buying station.
‡ $ 4* $
The contract, No. AT (05-1)-1039, was signed by representatives of the parties on or about February 4, 1957. The title of the contract is simply, “ore purchase agreement,” and under Article II, similar payment provisions to that of Article III of the April 26,1956, contract are found, although the second alternative lime penalty for excess of six percent CaC03 reads:
(3) Schedule II — No payment will be made for any constituent of ores other than U3Os in ores delivered hereunder.
41. Computations for payment of the ore shipped to the Monticello ore purchase station were made on form settle *96 ment sheets (for ore delivered through February 1957), which settlement sheets bore the heading, “western uranium project, lucius pitkin, inc., Ore Purchasing Agent for United States Atomic Energy Commission.” The lower portion of the form document, wherein plaintiff’s corporate signature was affixed, carried several certifications, among which are:
*****
I hereby transfer to the Commission, effective as of the date of delivery of the ore, all my right, title and interest in and to said ore.
I will accept the amount as shown above as “Total Gross Price” in full settlement for sums due to me on account of the ore deliveries described herein.
42. During the latter part of 1956, a series of tests were conducted on the ore of plaintiff by qualified agencies, at the request of the A.E.C. Operations Office at Grand Junction, Colorado, to determine the composition of the ore and its amenability to process under the technique proposed by Texas-Zinc Minerals for its mill which was to be located at Mexican Hat, some 30 miles from plantiff’s operation. The results of the tests showed that plaintiff’s ore was amenable to process under the proposed technique, that the ore contained U308 recoverable from the uraninite mineral, and that vanadium and copper were also found in the ore.
43. On February 6,1957, Texas-Zinc Minerals sent a communication to plaintiff, quoted in pertinent part, as follows:
We understand you have been shipping and selling uranium ore to the A.E.C. Buying Stations either at White Canyon or Monticello. The purpose of this letter is to inquire whether or not you are interested in selling part or all of your uranium ore production to us for treatment at our Mexican Hat mill.
The Mexican Hat mill will use the acid leach process designed for treatment of low carbonate ores. Part of mill capacity is reserved for custom ores. We will purchase economically and metallurgically amenable uranium ores at Mexican Hat under the terms set out in A.E.C. Circular V, Bevised, and at rate of delivery to be agreed upon with each ore producer.
*97 44. Two days later, on February 8,1957, Texas-Zinc Minerals sent plaintiff tbe following letter, which was more specifically directed at purchasing plaintiff’s ore production:
This will confirm information given to you during our telephone conversation February 5 in which you inquired about our plans to purchase uranium ore at our new mill at Mexican Hat.
We understand you produced and shipped to Monti-eello last month about 3,600 tons of uranium ore analyzing. about 0.33% U8Os and that uranium to vanadium ratio is about 1:1. As you get your ore bodies developed you may wish to increase production to 8,000 to 10,000 tons per month.
We will be pleased to purchase this ore on the basis set out in the A.E.C. Circular V, Revised less the standard A.E.C. lime penalty. However, ore need not be broken to pass a 12" grizzly. We can accept up to 18 to 20" chunks.
The Mexican Hat mill will use an acid leach process. We have had difficulty in obtaining sufficient solubili-zation of the uranium in several samples of Industrial ore that we have tested using the standard procedure for an acid leach. Further testwork had indicated methods with improved results that warrant our purchase of your ore on these terms for checking with test runs at full mill scale. Continued purchasing of your ore will depend upon our determination of its economic and metallurgical amenability.
Due to economic consideration at this time we cannot accept large tonnages of ore containing less than 0.20% UsOs.
At this time we can accept the ore you intend to produce which we understand will be in the range of 4,000 to 5,000 tons per month during the next six months. We must reserve the right to periodically change maximum tonnage we can accept unless you wish to enter into a contract for the sale of a specific quantity of your production over a mutually agreeable period of time.
It is expected our crushing and sampling plant can be started the latter part of this month. We can start receiving your ore as soon as we can activate that part of our mill. You and your representatives are welcome to inspect our crushing and sampling facilities to observe preparation of samples from your ore.
Additional details will need to be determined for us to handle the purchasing of your ore. We will communicate further with you in that regard. Generally *98 we expect to follow much the same systems that are in use by the A.E.C. at Monticello.
We can settle on a monthly average basis _ for all lots that analyze 0.10 U308 or more. We had intended to operate our purchase station on a one shift basis (day shift), at the start of operations, but if necessary to accommodate you and your truckers we will consider receiving ore on a second shift (afternoon shift).
Dr. Herzog had mentioned to Mr. Bishop that we were preparing letters to producers inquiring if they were interested in selling ore to us at Mexican Hat. The letter to you was “in the press” when you called, and is enclosed for your information.
We thank you for the offer of your ore and if you have additional questions please do not hesitate to call on us.
45. On the basis of the A.E.C.’s suggestion that plaintiff look to Texas-Zinc Minerals for deliveries and purchases of its ores, and the arrangements derived from conversations and correspondence with Texas-Zinc Minerals, plaintiff commenced and continued to make ore shipments to Texas-Zinc Minerals’ Mexican Hat plant until April 1958. Plaintiff received payment for both uranium and vanadium constituents for ore deliveries during this entire period from March 1957 through April 1958.
During and after the period referred to, plaintiff delivered lesser quantities of ore to other privately-owned mills such as the facility of the Hare Metals Corporation at Tuba City, Arizona, and the Vanadium Corporation of America plant at Durango, Colorado. Until March 1958, Bare Metals Corporation and Vanadium Corporation paid for both the uranium and the vanadium in plaintiff’s ore.
46. Payment for ore received by Texas-Zinc Minerals was made in accordance with settlement sheets bearing the name “Texas-Zinc Minerals Corporation” and itemizing the sums determined to be due. Next to the Seller’s signature each sheet carries the following certifications:
I certify that I am the lawful owner or authorized Bep-resentative of the Lawful Owner, of the Ore described in this Settlement Sheet and have legal right to deliver the same to Texas-Zinc Minerals Corporation.
I certify that I hold A.E.C. Source Material License numbered above.
*99 I hereby transfer to Texas-Zinc Minerals Corporation, effective as of the date of delivery of the ore, all right, title and interest in and to said ore.
I will accept the amount as shown above as “Total Gross Price” in full settlement for sums due to me on account of the ore deliveries described herein.
Buyers assays govern if Seller fails to submit his assays within 10 days after Buyer mails weight and assay certificate.
Payment for said ore is at prices, premiums and allowances for uranium and vanadium content not less favorable to the Producers than those set forth in the United States Atomic Energy Commission’s Circular V, Revised, or any amendment thereto, effective at date of delivery of said ore, unless otherwise provided in contract applicable to ore delivery described herein.
The settlement sheets of other private mills which received ore were similarly printed and were executed by plaintiff’s duly authorized representatives as a prerequisite to securing payment for the ore delivered. Payment for all such ore was made by check issued by the company whose mill received the ore.
47. On March 20,1958, Rare Metals Corporation of America, owner of a processing mill where plaintiff had delivered some of its ore and received payment for the uranium and vanadium constituents therein, notified plaintiff as follows:
By official release dated August 29, 1957, the Atomic Energy Commission announced a new uranium ore purchasing schedule, effective July 1,1957, providing for the discontinuance of vanadium payments at all of its ore buying stations with the exception of the commission’s ore buying station at Monticello, Utah. This official release also set forth the policy of the Commission to no longer include a credit for vanadium in all new agreements for the purchase of uranium concentrates from private mills m low vanadium areas, including the Cameron, Arizona area.
A new purchase agreement for uranium concentrates has been entered into between Rare Metals Corporation of America and the Commission, effective April 1,1958. This agreement provides for the discontinuance by the Commission of reimbursement for vanadium contained in ores processed at the Tuba City mill and provides *100 further that Eare Metals Corporation of America is no longer required to pay for vanadium in ores purchased, effective with April deliveries.
In view of this new agreement, Bare Metals Corporation has no economic alternative other than to discontinue payments for vanadium in ore received at the Tuba City mill after March 27,1958, the end of the settlement period for March deliveries.
Your temporary ore purchase agreement will, therefore, expire on March 27,1958. While we have intended to oner you a non-vanadium contract beyond that date, recent correspondence received from the Navajo Tribe casts some doubt upon this possibility.
We are trying to resolve this matter at Window Kock and will keep you advised of further developments. We hope we are successful and that we will be able to resume ore purchases from you in the near future.
48. In April 1958, Texas-Zinc Minerals’ mill underwent a temporary shutdown, forcing a 3-month suspension of plaintiff’s ore deliveries. During this interim period, plaintiff delivered to the A.E.C.’s Monticello ore purchasing station 9,000 tons of uranium-bearing ore, under the terms of a contract with A.E.C. labelled “oíos purchase agreement.” Payment for the mineral contents of the ore was upon the following terms:
Article II
Delivery of ores hereunder will be in accordance with the conditions set forth in the United States Atomic Energy Commission’s Domestic Uranium Program Circular 5, Eevised, and payment for ores delivered and accepted hereunder will be at the prices, premiums, and allowances as set forth in said circular or any revision or amendment thereof, except that:
(a) The Buyer will purchase ores containing lime (CaC03) in excess of six percent (6.0%) but only upon the following terms and conditions:
(1) The Buyer will compute the price payable for such ores in accordance with the methods herein provided in both Schedule I and Schedule II. The higher of the two prices thus determined by the Buyer will thereupon be paid to and accepted by the Seller for all ores delivered hereunder.
(2) Schedule I-A deduction from ore payment will be made of One Dollar ($1.00) *101 per dry ton plus thirty cents ($0.30) per dry ton for each one percent (1.0%) of lime (CaC03) content in excess of six percent (6.0%) fractions in proportion; or
(3) Schedule II — No payment will be made for any constituent of ores other than U3Os in ores delivered hereunder.
(b) Buyer will not be required to accept any ore delivered hereunder which contains in excess of 10 percent moisture.
(c) It is intended that the Seller deliver ores containing at least 0.20% U308. In the event that the average grade for any calendar month delivered hereunder is less than 0.20% U308, the Buyer may terminate this contract by so notifying the Seller in writing at any time within thirty (30) days from the end of a calendar month in which shipments have averaged less than 0.20% U3Os. Failure of the Buyer to exercise this right to terminate in the case of any particular calendar month shall in no event be considered a waiver of subsequent rights to terminate for monthly shipment averages of less than 0.20% U308.
49. With the reactivation of the Texas-Zinc Minerals’ mill, plaintiff resumed its ore shipments to Mexican Hat.'. Plaintiff received payment for the vanadium content of its ores delivered to Texas-Zinc Minerals, and it was charged with a lime penalty for excess content of CaC03 until August 1, 1958.
50. On or about June 26, 1958, the president of plaintiff company visited the A.E.C. office at Grand Junction, and had a conference with representatives of defendant. Plaintiff sought a continuance of payment for vanadium values from ores delivered at processing mills. A.E.C. representatives replied that vanadium payments would continue only to the extent that plaintiff delivered its ore to vanadium mills. Plaintiff was informed by officials of A.E.C. that Texas-Zinc Minerals would no longer pay for the vanadium values in the ore. Plaintiff requested permission to continue delivering at Monticello, as it had during the. months of April through June 1958. The A.E.C. informed plaintiff that its ore would be refused at the Monticello purchasing sta *102 tion after June 30,1958, because the station would be closed thereafter.
51. Commencing in August 1958, and continuing through December of that year, plaintiff made arrangements with regard to ore delivered to the Eare Metals Corporation and the Vanadium Corporation of America mills, whereby it would receive payment for the vanadium content of the ore. This plan, partly premised on the hope of forcing the Texas-Zinc Minerals’ mill to accept the terms of a proposed purchase agreement with plaintiff which included payment for vanadium, had to be abandoned because plaintiff could not meet the grade requirements and there was also a heavy haulage penalty. It thus became impossible to operate the plan on an economical basis. Actually plaintiff did not receive payment for vanadium content from Eare Metals Corporation after March 27,1958.
52. In November 1958, the president of plaintiff company met with representatives of A.E.C. at Grand Junction to inquire about the vanadium payments which plaintiff desired. Eepeating their prior reply, the representatives of A.E.C. informed plaintiff that vanadium payments would be made only if the ores were delivered to vanadium mills. Plaintiff again sought permission to deliver at Monticello. The request was denied.
Accompanying plaintiff at the November 1958 conference were representatives of another mining company. A proposal was advanced to the effect that, with official sanction, plaintiff and the other mining company represented (and possibly other mine owners in the area) might combine for the purpose of constructing another mill. This proposal was not approved. Allan Jones, General Manager of the Operations Office of A.E.C. at Grand Junction, stated that no more mills would be built in the area because the capacity there was sufficient.
53. On or about January 1,1959, Texas-Zinc Minerals entered into a written agreement with plaintiff whereby in each ensuing 6-month period (until as late as March 31, 1967), plaintiff company, referred to as “Owner,” would deliver to Texas-Zinc Minerals, referred to as “Processor,” between *103 12,000 and 36,000 tons of uranium ore for processing.[9] According to Article VII of the agreement, it was provided that: “Title to and ownership of the uranium content of Ore delivered by Owner to Processor hereunder, and of the uranium concentrate produced by concentration hereby, shall remain in Owner at all times until disposed of by Owner. * * *”
Simultaneously with the execution of the January 1,1959, agreement providing for the processing of the plaintiff’s ores by Texas-Zinc Minerals, the parties entered into a complementary agreement, which included the following options:
Owner grants to Processor the option (which may be exercised from time to time by written notice thereof to Owner) to purchase from Owner all or any part of the uranium concentrate returnable to Owner under the Milling; Agreement by reason of ore owned or controlled by Owner and delivered by it to Processor prior to the termination of this Agreement. Processor grants to Owner the option (which may be exercised from time to time by written notice thereof to Processor) to sell to Processor all or any part of the uranium concentrate returnable to Owner under the Milling Agreement by reason of ore owned or controlled by Owner and delivered to Processor prior to the termination of this Agreement. The elections to exercise said options to purchase or to sell shall designate and apply to U308 owned by Owner and contained in concentrate returnable from specified lots of uranium-bearing ore owned or controlled and delivered by Owner pursuant to the Milling Agreement. For all purposes of this Agreement the U308 content of such concentrate shall be deemed to be 90% of the U308 content of uranium-bearing ore delivered for concentration. Title to uranium concentrate and the U308 content thereof sold hereunder shall pass to Processor immediately upon the exercise of either of said options. Processor shall have the right to retain possession of all such uranium concentrate unless and until the options with respect thereto have expired without being exercised.
‡ ‡ ‡
*104 54. Under tbe provisions of the basic January 1, 1959, agreement entitled “milling agreement”, between Texas-Zinc Minerals and plaintiff, the parties agreed on processing charges for the treatment of ores delivered, computed on the basis of the percentage of U308 content in the ore. In addition, a lime (CaC03) penalty would be imposed by the processor, computed at the rate of $1.00 per ton for ores containing more than 6 percent lime, plus $0.30 per ton for each percent in excess of 6 percent, fractions in proportion.
Attached to the “milling agreement” and executed the same day was a document entitled “concentrate purchase agreement”, providing in part, for the purchase by Texas-Zinc Minerals of the product derived from the plaintiff’s ores, at the following agreed prices:
(A) $8.00 for each pound of U308 content of concentrate purchased hereunder; and
(B) An amount equivalent to 6 cents per wet ton of uranium ore from which such concentrate was produced for each mile, not in excess of 100, that such uranium ore is transported by or at the expense of Owner for delivery to the Mill.[10]
There follows a provision which permits the mill to off-set processing charges against amounts due for the purchase of concentrates.
55. At the end of November, or the beginning of December 1959, plaintiff had conversations with representatives of the Kerr-McGee Oil Industries, Inc. processing mill at Ship-rock, New Mexico. As a result of these conversations, wherein vanadium payment was discussed and tentatively agreed upon, plaintiff sought approval from the A.E.C. by letter dated December 3, 1959, to deliver approximately 3,000 tons of its ore per month to Kerr-McGee starting in February 1960.
The request was denied in A.E.C’s letter of January 8, 1960, to plaintiff, citing the following reason:
This ore sale would be in addition to the 72,000 tons per year provided for in a contract between your com *105 pany and Texas-Zinc Minerals Corporation. This contract, dated January 1, 1959, was approved by the Commission.
Since your Monument Valley property is currently assured of a reasonable market, we cannot approve your request for an additional market at Shiprock.
56. On December 1,1959, Texas-Zinc Minerals and plaintiff amended their January 1,1959, agreement, including the option to purchase, to allow for the additional delivery of ore of “not less than 3,000 tons nor more than 4,000 tons” during the period beginning December 1, 1959, and ending June 30,1960.
57. During the continuation of the milling and option to purchase agreements, in effect from January 1,1959, through and beyond December 1962, Texas-Zinc Minerals regularly exercised its option to purchase the uranium concentrate derived from the ore delivered to it by the plaintiff. Settlement sheets for these transactions bear the inscription:[11]
As provided in the Concentrate Purchase Agreement effective January 1, 1959. Texas-Zinc Minerals Corporation hereby exercises its option to purchase the concentrates upon which the above treatment charges were incurred.
The settlement vouchers also indicate the vanadium content of the ore processed, although no payment therefor is recorded. In addition, the copper (Cu) content is shown, and an entry is found on each settlement sheet recording a credit made by Texas-Zinc Minerals against “Treatment Charges” for the copper values in the ore treated.
58. During the course of its operations through March 31, 1962, plaintiff delivered a total of 3,506,445.85 pounds of vanadium to AJE.C.’s Monticello ore purchasing station and to privately-owned mills. At the Circular 5 price of $0.31 a pound plaintiff would have received $1,103,605.72 for vanadium values, if payment had been made for all deliveries. Plaintiff received $304,396.72, leaving a balance of $779,209 remaining unpaid.
*106 Also, during tbe course of its operation through. March 31, 1962, plaintiff was charged by the AJE.C.’s Monticello ore purchasing station and privately-owned mills the amount of $83,158.75 for excess lime in its ore.
THE TEXAS-ZINC MINERALS CORPORATION CONTRACTS WITH THE ATOMIC ENERGY COMMISSION
59. Beginning in August 1955, and continuing into July 1956, the A.E.C., through its Grand Junction Office, engaged in negotiations with the Texas-Zinc Minerals Corporation (and its predecessor, the New-Shat-Tex Corporation) for the construction of an ore processing plant at Mexican Hat, Utah.[12] As required by A.E.C., Texas-Zinc Minerals furnished the A.E.C. with data upon which justification for a new mill was based in the first instance. Included in the data submitted there was information pertinent to plaintiff’s operation, as a tributary uranium ore producer with an estimated reserve of 100,000 tons of ore.
Tests were run on plaintiff’s ore at the request of the A.E.C. to determine its amenability to the process proposed to be used by Texas-Zinc Minerals in the recovery of uranium for sale to the A.E.C.
60. On July 17,1956, the A.E.C. and Texas-Zinc Minerals Corporation concluded Contract No. AT(05-l)-696 for the construction of a processing plant at Mexican Hat, Utah. Under the terms thereof, the A.E.C. agreed to purchase the uranium concentrate product of the new mill on a unit price basis. Concerning the acquisition of ore for processing, the contract’s Article VII provided, in part:
1. In addition to processing ores from mines it may own, lease, or otherwise control, the Contractor agrees to purchase from independent producers, ores that are offered for sale and, in the opinion of the Contractor, are amenable to its process for treating ores at prices, premiums and allowances for uranium and vanadium content of ore and upon terms and conditions and sub *107 ject to specifications not less favorable to the producers than the provisions of the Commission’s Domestic Uranium Program Circular 5, Bevised, or any amendment thereto, provided that the Contractor shall not be required to purchase more than twenty percent (20%) of the Contractor’s ore requirements during any calendar year. The Contractor agrees that on or about the effective plant date it will issue a public announcement offering to purchase ore from independent producers.
*****
61. On March 1,1957, a Supplemental Agreement to Contract No. AT (05-1)-696 entitled Modification No. 1, was entered into by A.E.C. and Texas-Zinc Minerals, wherein the provision calling for purchases of ores from independent producers at prices no less favorable than Circular 5, Be-vised, prices was restated; however, the Modification added that a lime penalty of $1.00 per dry ton and $0.30 per dry ton for each percent of lime (CaC03) in excess of 6 percent could be charged.
In addition, the Modification called for an advance by A.E.C. to Texas-Zinc Minerals for purchases of producers’ ores of up to 75 percent of the price paid, or $1.5 million .in the aggregate, whichever was greater. The advances could be made until feeding of the ore to process began or to January 1,1958, whichever date occurred first. Sums advanced for ore purchases would be applied by the A.E.C. against future concentrate deliveries to it by the mill.
On June 5,1957, a chattel mortgage running to the A.E.C. on the ores held and owned by Texas-Zinc Minerals was executed as security for the advances made to the extent of $1.5 million. Bepayment of the loan was to be completed by December 31, 1959, by means of “set off by the Mortgagee against payments due to be made to the Mortgagor by the Mortgagee for uranium concentrates to be produced in the Mortgagor’s uranium ore processing plant located at Mexican Hat, Utah, and delivered to the Mortgagee in accordance with the provisions of Contract No. AT(05-l)-696 between the parties hereto.”
62. On August 6, 1958, “Modification No. 2 Supplement Agreement to Contract No. AT(05-l)-696” was executed by and between the A.E.C. and Texas-Zinc Minerals, effective *108 July 1, 1958. The Modification No. 2 reflected (and so stated) the new Domestic Uranium Program announcement of May 24, 1956. In this regard, the agreed base price for purchase of uranium concentrate by the A.E.C. during the extended period of the original contract from April 1, 1962 through December 31, 1966, would be $8.00 per pound, as announced.
For uranium concentrate purchases from July 1, 1958, through March 31, 1962, the Modification reduced the base price from $8.15 per pound (as originally agreed upon) to $7.95 per pound. The reduction in base price for uranium concentrate was arrived at by means of a renegotiation of the orginal contract for the term of its orginal effectiveness through March 31, 1962, based on a restudy of cost factors to the mill. Among the cost factors that were pertinent in the study for renegotiation was the price for ores purchased from independent producers. In this regard, Article VII of Contract No. AT(05-1)-696 was changed to read in part, as follows:
1. In addition to processing ores from mining properties which it may own, lease, or own an interest in, the Contractor agrees to purchase or otherwise acquire for processing in the plant ores offered to it by independent producers during the term of this contract that are economically and metallurgically amenable to processing in the plant. During the term of this contract ending March 31, 1962, the Contractor shall not be required to acquire from independent producers more than fifty percent (50%) of the tonnage of ore fed to process during any fiscal year (July 1 to June 30, inclusive) nor shall the Contractor be required during the term of this contract subsequent to March 31, 1962, to acquire from such producers uranium ore containing more than fifty percent (50%) of the U3Os in ores fed to process in the mill during any fiscal year. For purposes of this paragraph, fifty percent (50%) of the first four thousand (4000) tons of ore taken during each calendar month from the stockpiles purchased from the Commission under paragraph 3 of this Article and processed in the plant shall be considered as ore purchased or acquired from independent producers. Ores purchased under this paragraph prior to April 1, 1962, shall be acquired at prices, premiums, and allowances and upon *109 terms and conditions and subject to specifications not less favorable to the producers than the provisions of the Commission’s Domestic Uranium Program Circular 5, Kevised, or any amendment thereto, except that the Contractor shall not be required to pay for any metal content of such ores other than U308 content.
* * ^ ❖ *
63. Although the A.E.C. desired to eliminate, as a cost factor, all payment for minerals other than uranium in the ores purchased by Texas-Zinc Minerals from independent producers, a $0,025 cost factor for each pound of concentrate produced was retained in arriving at the new base price of $7.95 under the August 6, 1958, Modification. This $0,025 cost factor represented reimbursement to the mill for its obligation to the Navajo Indian Tribe, under its leasing arrangement, for vanadium processed in the mill.[13]
64. Prior to the formal agreement of January 1,1959, ore sales and purchases between plaintiff and Texas-Zinc Minerals were by letter agreements. The exchange of letters continued through the August 1, 1958, date, at which time payment for vanadium content in plaintiff’s ore was discontinued, formal notification to that effect having been rendered and received by letter of August 22,1958, from Texas-Zinc Minerals Corporation to plaintiff, reading in part as follows:
Kindly substitute the enclosed statement regarding our practice of making payment for copper for the one enclosed with our letter to you dated August 18,1958. Due to an oversight on our part, we enclosed with our letter of August 18, a copy of our old schedule of payment which provided for vanadium payment under certain conditions. Beginning August 1, 1958, the A.E.C. discontinued making vanadium payment to us and effective *110 that date, Texas-Zinc discontinued making payment for vanadium also.[14]
85. Except for the 3 to 1 lime test and the 8% lime test, plaintiff’s deliveries of ore, now involved, complied with all the pertinent requirements of Circular 5 (as originally issued and as revised). See also finding 38. From the inception of the program, A.E.C. regularly accepted and paid for ore which failed to meet the 3 to 1 test, never rejected ore from any producer on that ground, never required its rejection by the private mills, and never indicated any intention to enforce this criterion; accordingly, this provision of Circular 5 was effectively waived by the A.E.C. as a condition of eligibility for Circular 5 coverage. However, the A.E.C. never waived the 6% lime requirement, consistently making it clear that ore failing that test was not covered by Circular 5 and would have to be sold and purchased outside of the coverage of Circular 5.
CONCLUSION OF LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover as provided in the opinion and judgment is entered to that effect. The' amount of recovery will be determined pursuant to Bule 47(c).
In accordance with the opinion of the court, a stipulation of the parties and a memorandum report of the commissioner, it was ordered on August 25,1967, that judgment for the plaintiff be entered for $645,000.

A physiographic province located in the western united States, encompassing about 107,000 square miles, touching on the states oí Utah, Colorado, New Mexico and Arizona, the outer limits of which are not clearly delineated by the very nature of what the name describes. Roughly, it describes an area bordered on the west by the Wasatch Mountains of Utah, on the north by the Boole Cliffs, then east to Just beyond Grand Junction, Colorado, then south to the San Juan Mountains into New Mexico, and south and west to a point across the Little Colorado River.

 Approved August 30, 1954, 68 Stat. 921. -Under the authority of both Acts, all atomic energy activities in the United States were, at all times pertinent to this case, subject to the stringent controls and restrictions of the Atomic ¡Energy Commission.

 Compare what now appears at 42 U.S.C. 2011.

 See 10 C.F.R. (1949 ed.) §40.2 (c) and (d).

 Nearly 350 of these were introduced in evidence, plug two volumes of collected speeches by representatives of the A.H.C., which contain 68 talks given during the period between August 30, 1950, and March 17, 1962. This material forms only a small portion of the storehouse of information in the Grand Junction office library available to the interested public.

 In view of all tlie testimony in this case, it is fair and accurate to state that at all times during the plaintiff’s mining operation, it labored under the impression that if it could not -obtain the guaranteed price under Circular 5, Revised, infra, from the ore-buying station with which it dealt, it had an unqualified right to deliver directly to and receive payment directly from the A.E.C.

 To be distinguished throughout from ore-purchasing contracts, notwithstanding that generally the proposed concentrate or mill contractor mined and owned large volumes of ores, which, it was anticipated, the proposed mill would process. The ores owned by the prospective miller were known as “captive ores,” as opposed to oPes of other miners known as “custom ores.”

 In some instances, a request by the mill to increase its level of production by purchase from independent producers of additional ores was expressly refused (see Finding 55).

 Although the findings show that legal title to the ores under this arrangement with Texas-Zinc Minerals remained in the plaintiff until the processor exercised its option to purchase the refined product (the concentrate), it appears that the legal arrangement, in itself, which was for tax purposes, would not have precluded vanadium payments to plaintiff.

 This mileage allowance is identical, in effect, with that under Circular 5, ■ Revised (see Finding 16).

 These inscriptions were typewritten and have minor differences in punctuation, spelling, etc.

 The words “negotiations * * * for the construction of an ore processing plant” are used advisedly In this finding. Although the contract sought by the prospective mill operator was primarily for the sale of concentrates to the A.E.C., there is no question that without a contract, no mill could be constructed.

 under the original contract, the corresponding cost factor for vanadium processed by the mill had been $0,225 for each pound of concentrate produced, This factor consisted of $0.20 per pound for vanadium recovery from ores purchased from independent producers and $0,025 per pound as royalty payments to the Navajo Indian Tribe for vanadium processed under the mills lease agreement.
In the summer of 1958 renegotiation, the A.E.C. first attempted to eliminate the entire $0,225 factor for vanadium. Texas-Zinc Minerals resisted, and after reconsideration, the A.E.C. allowed $0,025 per pound as a factor for vanadium on the basiB that the lease arrangement with the Indian Tribe constituted a legal cost to the mill in its operation.

 There is no cogent explanation as to why Texas-Zinc Minerals continued to make vanadium payments for deliveries made from July 1, 1958, through the end of that month. Plaintiff attempted to elicit testimony to the effect that the A.B.C. reimbursed Texas-Zinc Minerals for payments for vanadium to producers in July 19S8; however, there is no proof to this effect, although the terms of the letter of August 22, 1958, from Texas-Zinc Minerals would reasonably lead to that inference.